# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 27, 2023

Lyle W. Cayce
Clerk

No. 21-30359

───────────────

United States of America,

*Plaintiff—Appellee,*

*versus*

William B. Hungerford, Jr.,

*Defendant—Appellant.*

───────────────────────────────

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CR-112-1

───────────────────────────────

Before Willett, Engelhardt, and Oldham, *Circuit Judges.*

Per Curiam:[*]

William B. Hungerford challenges his conviction on nine counts of various forms of fraud and money laundering. He raises twelve alleged trial errors. We find no reversible error and affirm.

───────────────────────────

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-30359

## I.

## A.

The crimes in this case arise from a federal foreign investment program known as "EB-5." United States Citizenship and Immigration Services ("USCIS") uses the EB-5 program to offer wealthy aliens a pathway to permanent residence. Alien investors must invest $1,000,000 of capital in a qualified business, maintain that investment for at least two years, and show that the investment created at least ten American jobs by the end of the two-year period. **ROA.8442–3**. But if the alien investors send their capital to targeted employment areas—rural areas or high unemployment areas in need of economic investment, like New Orleans after Hurricane Katrina—then the EB-5 program only requires a $500,000 investment. **ROA.8443.** The program also allows investors to contribute their capital to "Regional Centers" that pool investor capital to promote growth in a particular geographic region. **ROA.2062**. Aliens who invest money in creating American jobs in accordance with the EB-5 rules can apply for permanent residence.

Three immigration forms play important roles in the EB-5 program. The first is the I-526. An immigrant investor files an I-526 petition to enter the United States as a conditional permanent resident. The I-526 requires the immigrant investor to show that he has made the required investment in the United States and to submit a business plan for creating the required American jobs. After USCIS approves the I-526 petition, the immigrant investor receives conditional permanent residence status (colloquially called a "temporary green card") for two years. At the end of the two-year investment period, the investor may file an I-829 petition for removal of conditions on their residency (colloquially called a "permanent green card"). The I-829 requires the immigrant investor to show that he did not receive

any of the invested money back and that the required jobs were in fact created. The final form that is important for this case is the I-924. The I-924 is an annual report filed by a Regional Center. The Regional Center uses that form to certify to USCIS that it continues to meet the EB-5 eligibility criteria by promoting growth and jobs in its designated region.

### B.

Hungerford and his partner, Timothy Milbrath, opened the New Orleans Regional Center ("the Center") as part of the EB-5 program. They operated the Center from 2007 until 2012. **ROA.5730–33, 9543.** Hungerford and Milbrath ran the Center through their company, NobleOutReach, LLC ("NOR"). **ROA.3638.** NOR served as "an umbrella entity" over the Center's portfolio projects. And those portfolio projects were the purportedly job creating entities ("JCEs") that would ultimately satisfy the EB-5 program's job-creation requirements. **ROA.8442.**

Hungerford and Milbrath recruited forty-six aliens to invest with the Center. Thirty-one of those aliens submitted I-526 petitions for temporary green cards via the EB-5 program. **ROA.13114.** The documents NOR prepared for the investor petitions included assurances that the Center's JCEs would be located within Orleans Parish and that the minimum investor capital ($500,000 per investor) would be invested within the geographic boundaries of the New Orleans targeted employment area. **ROA.10692–94.**

As it turns out, however, Hungerford and Milbrath did not invest the aliens' money to create jobs in New Orleans; they instead used that money to enrich themselves. Hungerford and Milbrath established Bay-Nola-Management ("BNM") as a purportedly New Orleans-based JCE. BNM purported to provide "marketing, financial management, due diligence and business analysis" in New Orleans. **ROA.8587.** And in NOR's required I-924 annual reports to USCIS, signed by Hungerford under penalty of perjury,

No. 21-30359

NOR claimed BNM performed "Food Service" and "Construction," and listed BNM's and NOR's addresses as in New Orleans. **E.g., ROA.2130, 2367–69.** But BNM operated primarily out of Maryland, where Hungerford and Milbrath lived, not out of New Orleans. Mail addressed to BNM went to a New Orleans address, only to be forwarded to the Maryland office. **ROA.2359.** And there is no evidence that BNM actually created jobs in New Orleans, or that BNM was anything more than a pass-through entity for funneling money back to Hungerford and Milbrath via their corporate alter ego, NOR.

The fraud came to light when the thirty-one alien investors filed their I-829 petitions for permanent green cards. USCIS denied the aliens' petitions on the grounds that NOR could not sufficiently demonstrate that the investors' funds had been used in New Orleans. **ROA.3659; 12116–19.** In 2012, several investors sued NOR based on their lost investment and denied immigration petitions. Despite the suit, Hungerford and Milbrath continued to file quarterly reports with the city of New Orleans, reaffirming that their remaining capital was still invested in New Orleans, and NOR continued to hold property in New Orleans. **ROA.7956–8027, 8028–99, 8100–71, 8173–8247.** NOR finally sold one property, Maurepas Foods, in 2016, but Hungerford and Milbrath split the proceeds ($120,000 each), rather than reinvesting the money in New Orleans. **ROA.13365; 13395–96**.

In 2018, a grand jury indicted Hungerford and Milbrath with nine counts: three counts of conspiracy to commit mail/wire fraud, immigration fraud, and money laundering and six counts of substantive wire fraud. After a three-week trial, the jury convicted both defendants on all counts. Hungerford timely appealed.[1]

---

[1] Milbrath died in custody after filing his opening brief in this appeal.

## II.

Hungerford raises twelve alleged trial errors.[2] We divide them into four categories: (A) four sufficiency-of-the-evidence challenges, (B) a constructive-amendment-of-the-indictment claim, (C) three improper-witness-testimony challenges, and (D) four jury-instruction claims. He also claims that (E) even if no individual error is reversible, their cumulative effect is. We address each category in turn.

## A.

Hungerford properly preserved his sufficiency objections. Therefore, our review is *de novo* but with "great deference" to the jury's verdict. *United States v. Churchwell*, 807 F.3d 107, 114 (5th Cir. 2015). This court "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jordan*, 945 F.3d 245, 255 (5th Cir. 2019) (emphasis omitted) (quotations omitted); *see also United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020).

Hungerford challenges (1) the conspiracy convictions and (2) the substantive wire fraud convictions based on the sufficiency of the evidence.

---

[2] The twelve alleged errors are: insufficiency of the evidence for the (1) mail and wire fraud, (2) immigration fraud, and (3) money laundering conspiracies; (4) insufficiency of the evidence for the substantive wire fraud counts; (5) constructive amendment of the immigration fraud conspiracy count; (6) improper expert testimony from lay witness Jan Lyons; (7) improper hearsay evidence; (8) improper summary witness testimony from Yvonne Evans; and improper jury instructions (9) for failure to issue an estoppel instruction, (10) incorrect use of an "ignorance of the law" instruction, (11) incorrect use of a "deliberate ignorance" instruction, and (12) failure to cure jury confusion.

No. 21-30359

1.

First, Hungerford says the Government introduced insufficient evidence that he conspired with Milbrath. To sustain a conspiracy conviction, "the Government must prove (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) (quoting *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003)); *see also United States v. Fiero*, 38 F.3d 761, 768 (5th Cir. 1994) (listing five elements of conspiracy to launder money that are represented by the three elements in *Mann*). Mail and wire fraud conspiracies require these same elements, except that they do not require an overt act. *See United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015).

In proving these elements, the Government may rely on indirect evidence. "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (citation omitted). The upshot: "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006) (citation omitted).

The record easily contains sufficient evidence to prove that Hungerford conspired to commit mail and wire fraud, immigration fraud, and money laundering. *See* 18 U.S.C. § 1349 (conspiracy to commit mail or wire fraud); *id.* § 371 (general federal conspiracy, here applied to the immigration fraud); *id.* § 1956(h) (conspiracy to launder money). In fact, the record *teems* with such evidence, so any attempt to describe it would be woefully

underinclusive. To hit just some highlights: Both Hungerford and Milbrath received equal payments from NOR, owned a 50% share of NOR, and, most importantly, each engaged in behavior to further the conspiracy, to enrich themselves with millions of dollars, and to conceal the conspiracy. They created circular transactions to move money into their pockets and then omitted those transactions from USCIS filings to deceive the Government. And both knew that their actions were unlawful under the constraints of the EB-5 program—USCIS told them several times that the investors' $500,000 contributions could *only* go toward investments in New Orleans. Moreover, Hungerford conspired with Milbrath to cause immigrant investors to submit fraudulent immigration forms. *See United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008) (holding conspiracy to make false statement can be proved where defendant conspired to cause a third party to make it). And Hungerford signed under penalty of perjury I-924 annual reports that he knew were fraudulent because BNM did not perform "Food Service" and "Construction" in New Orleans.

The Government therefore presented sufficient evidence to convict Hungerford on each conspiracy charge.

2.

Hungerford next challenges his substantive wire fraud convictions. "The elements of wire fraud under 18 U.S.C. § 1343 are: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *Simpson*, 741 F.3d at 547–48 (quotation omitted). Hungerford's wire fraud convictions were based on five quarterly report emails he filed with the city of New Orleans and one sale of an NOR-held property, Maurepas Foods. **ROA.145–46; ROA.7886–955, 7956–8027, 8028–99, 8100–71, 8173–247; ROA.13365–69.**

7

No. 21-30359

To satisfy § 1343, the fraudulent wire need only be "incident to an essential part of the scheme [to defraud] or a step in the plot." *United States v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011) (alteration adopted) (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)). And wires that conceal or delay detection of an ended scheme can be considered essential to the scheme. *See United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986). That is because "actions taken to avoid detection, or to lull the fraud victim into complacency, can further the fraud." *United States v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996) (citing *United States v. Maze*, 414 U.S. 395, 402–03 (1974)).

Here, each of Hungerford's five email reports contained assurances that the EB-5 investments were still located in New Orleans and that NOR was pursuing the Center's goals. *See* **ROA.7886–955, 7956–8027, 8028–99, 8100–71, 8173–247;** *see also* **ROA.2701–14.** But trial evidence showed that substantial portions of the investments were actually in Maryland or in the defendants' pockets and that no significant work had been done in New Orleans for years. And the property sale was an even more direct piece of the scheme to defraud. Although the sale proceeds initially went to an NOR holding, they never got reinvested in New Orleans. Instead, Hungerford and Milbrath split them 50/50. A reasonable jury could certainly have found that Hungerford meant these wires to lull the city into believing that the Center was still investing in New Orleans while he wrapped up the loose ends of his scheme. Therefore, there was sufficient evidence to support his convictions for substantive wire fraud.

## B.

Hungerford did not raise his constructive-amendment or material-variance claim to the district court, so we review the claim for plain error. *See United States v. Broadnax*, 601 F.3d 336, 340 (5th Cir. 2010). Under plain

error, "[t]he defendant must show that (1) the district court committed an error, (2) the error is plain, (3) the error affects his substantial rights, and (4) failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. del Carpio Frescas*, 932 F.3d 324, 332 (5th Cir. 2019) (per curiam) (citation omitted). Thus, "[r]elief under the plain-error standard 'will be difficult to get, as it should be.'" *United States v. Figueroa-Coello*, 920 F.3d 260, 264 (5th Cir. 2019) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)).

"A constructive amendment occurs when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment, or . . . proves an essential element of the crime on an alternate basis . . . not charged in the indictment." *United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015) (citation omitted). Its less-severe sibling, a material variance, "occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Rodriguez*, 553 F.3d 380, 392 (5th Cir. 2008) (citation omitted). Generally, constructive amendments are reversible error per se, while material variances are reviewed for harmless error. *See United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012). But under plain error review, even if a difference between the indictment and the proof at trial constituted a constructive amendment, we will reverse only if the amendment was also a clear or obvious error that affected the defendant's substantial rights and meets our discretionary threshold. *See Broadnax*, 601 F.3d at 340.

In determining what represents an amendment, the constructive amendment rules lie on top of rules governing the specificity of indictments. In general, "[a]n indictment is not required to expressly set out every action of the defendant which may have contributed to the commission of the crime

charged. Rather, the chief purposes of an indictment are to apprise the defendant of the specific charges he will be asked to rebut at trial and to protect him against double jeopardy." *United States v. Moree*, 897 F.2d 1329, 1333–34 (5th Cir. 1990) (citation omitted). If the indictment specifies "one particular kind of falsity . . . [then] a conviction must rest on that charge." *United States v. Adams*, 778 F.2d 1117, 1125 (5th Cir. 1985). Thus, whether it is an error to allow the Government to present new or different evidence from that specified in the indictment turns on both the contents of the indictment and the degree of difference between the charges and the evidence at trial.

Similarly, the constructive amendment doctrine serves chiefly to protect defendants from unfair surprise evidence at trial and from successive prosecutions for the same offense based on different evidence. *See Berger v. United States*, 295 U.S. 78, 82 (1935) ("The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense." (citation omitted)). If any amendment did not affect one of these two substantial rights, then we cannot say that it was plain error for the district court to allow evidence outside of the indictment.

Here, Hungerford contends that the prosecution constructively amended or materially varied from the immigration fraud charge levied by the grand jury by introducing I-924 annual reports that Hungerford signed under penalty of perjury and submitted to USCIS to demonstrate compliance with the EB-5 program. True, the indictment mentions two immigration forms required by the EB-5 program (the I-526 and I-829 petitions, which immigrant investors submit to adjust their immigration statuses) and does not mention I-924s. But Hungerford cannot show that the omission satisfies the high bar for plain-error relief.

No. 21-30359

First, there was no risk of unfair surprise. The grand jury indicted Hungerford and Milbrath for "knowingly and willfully combin[ing], conspir[ing] and agree[ing] to make and cause to be made material false statements under oath and penalty of perjury on an application or other document required by the immigration laws or regulations of the United States, in violation of Title 18, United States Code, Section 1546(a); all in violation of Title 18, United States Code, Section 371." **ROA.143.** The indictment further charged Hungerford with conspiring to make false "statements" (plural) on "an application or other document." **ROA.143.** Hungerford knew that the EB-5 program included several kinds of documents, including the I-924, and he knew that he had submitted the fraudulent I-924s. And he points to no case requiring an indictment to list each piece of evidence the Government will use to prove an indictment's allegations. As such, there was no fairness violation in introducing the I-924s.

Second, there was no risk of a second prosecution. Because the overarching charge was the conspiracy to commit immigration fraud, not the substantive crime of immigration fraud, there was no risk that leaving the I-924 forms out of the indictment would subject Hungerford to the risk of another prosecution based on the I-924 forms alone. The conspiracy charge covered the scheme as a whole, of which the I-924 forms were only a piece. That the district court allowed them to be introduced here arguably *protects* Hungerford from a future prosecution for this same scheme.

Thus, it is unclear there was any error. Even if there were, any error was not plain or obvious because none of our constructive-amendment or material-variance cases compel a finding of error here. And even if there were a plain error, Hungerford cannot show that he was prejudiced—much less that we should exercise our discretion to award relief.

11

No. 21-30359

## C.

Hungerford next alleges three evidentiary errors: (1) improper admission of hearsay evidence, (2) improper lay-witness testimony, and (3) improper summary-witness testimony. Hungerford raised his hearsay objection below, so we review it for abuse of discretion, "subject to the harmless error rule." *Jordan*, 945 F.3d at 257; *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005). But Hungerford failed to raise his lay-witness objection below, so there we review for plain error. *See Jordan*, 945 F.3d at 258. Finally, the parties dispute whether Hungerford sufficiently preserved his objection to the summary-witness testimony. The dispute does not matter because Hungerford's claim fails in any event.

### 1.

First, hearsay. Hungerford objected to the prosecution's introduction of out-of-court statements by Morrie Berez, a USCIS official-turned-NOR-consultant, concerning the legal requirements for running the Center. Although Berez did not testify, other witnesses offered a series of his comments, primarily in emails and documents, as evidence that Hungerford and Milbrath knew that their conduct was unlawful. Hungerford contends that these statements were inadmissible and that allowing them to be introduced constituted an abuse of discretion.

The district court did not abuse its discretion in allowing these statements because the statements were not hearsay. *See* Fed. R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."). Simply put, the prosecution did not offer Berez's statements for the truth of the matter asserted; instead, the prosecution argued that the statements went to Hungerford's knowledge that his conduct was illegal. **ROA.2410;** *see United*

*States v. Chavis*, 772 F.2d 100, 106 (5th Cir. 1985). That is not hearsay, and hence it was not an abuse of discretion to admit the statements.

2.

Second, lay witness Jan Lyons's testimony. Lyons was a USCIS official. Hungerford argues the Government improperly used Lyons to introduce legal opinions about USCIS's regulations and the agency's understanding of its own rules. Most importantly, Lyons testified to USCIS's interpretation of the EB-5 program, the regional center program, and its own guidelines. **ROA.2063, 2070, 2129.** But Hungerford did not object to Lyons's testimony on these grounds below, so we review the testimony for plain error.

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. Under Rule 701, "[i]t is . . . generally prohibited for a lay witness to interpret statutes and to give legal opinions." *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011).

Even if the district court committed plain error in admitting Lyons's testimony, Hungerford cannot show prejudice. Many of the conclusions from Lyons's testimony were repeated in other testimony and evidence. For example, perhaps the most important conclusion from Lyons—that Hungerford and Milbrath could not use the alien investors' $500,000 EB-5 funds for anything other than investment in the New Orleans JCEs—also appeared in Milbrath's book interview, **ROA.6270**, in the USCIS letter responding to the first temporary green card petition, **ROA.11985**, in NOR's response to that letter, **ROA.12051**, and in testimony from investors,

**ROA.1035–36**. Although Lyons's testimony was no doubt important, Hungerford cannot show a reasonable probability that, but for Lyons's testimony, Hungerford would have been acquitted. *Cf. United States v. Mims*, 992 F.3d 406, 409 (5th Cir. 2021) (requiring a "reasonable probability of a different outcome absent the error" in plain error review of a sentencing error). Therefore, allowing Lyons's testimony was not reversible plain error.

3.

Third, summary witness Yvonne Evans's testimony. Here too, Hungerford cannot show that the district court committed a reversible error under any standard of review.

The Federal Rules of Evidence allow witnesses to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Our precedent allows parties to call witnesses to summarize large volumes of evidence. *United States v. Nicholson*, 961 F.3d 328, 335 (5th Cir. 2020) (citing *United States v. Baker*, 923 F.3d 390, 397 (5th Cir. 2019)). As a general rule, summary witnesses of this kind are not supposed to introduce evidence that has not previously been presented to the jury. *Ibid.* There is no clear line between what constitutes fact-witness testimony and summary-witness testimony. *See United States v. Hart*, 295 F.3d 451, 457 (5th Cir. 2002); *United States v. Lucas*, 849 F.3d 638, 644–45 (5th Cir. 2017). Moreover, we have not held that a summary witness cannot *also* serve as a fact witness. *See Nicholson*, 961 F.3d at 335 (describing a witness as both).

Hungerford cannot show reversible error under any standard. The parties stipulated to the authenticity of the evidence that Evans reviewed, such as financial documents. **ROA.2680.** Insofar as Evans summarized that evidence, her testimony was admissible under *Nicholson*. And insofar as Evans strayed beyond that evidence to testify about new facts, Hungerford

No. 21-30359

has not shown that Evans could not serve as both a fact witness and a summary witness.

## D.

Preserved objections to jury instructions are reviewed for abuse of discretion. *United States v. Green*, 47 F.4th 279, 288 (5th Cir. 2022). We will find such an abuse only where "the defendant's requested instructions "(1) are substantively correct; (2) are not substantially covered in the charge given to the jury; and (3) concern an important point in the trial so that the failure to give them seriously impairs the defendant's ability to present effectively a particular defense." *United States v. Hale*, 685 F.3d 522, 541 (5th Cir. 2012) (alterations omitted). Moreover, we will vacate a conviction only if the requested instruction would have led to an acquittal. *Id.* at 541–42. Meanwhile, challenges raised only on motion for new trial or afterward are reviewed for plain error. *Id.* at 540.

Hungerford offered alternate instructions for his (1) estoppel instruction claim but did not object to the trial court's instructions for his (2) ignorance of the law instruction, (3) deliberate ignorance instruction, or (4) failure to cure jury confusion claims. Therefore, we review the first argument for abuse of discretion but the rest for plain error.

### 1.

Hungerford requested an estoppel instruction on the basis that USCIS had "approved" of Hungerford and Milbrath's conduct. That instruction read:

> The defendants assert the defense of equitable estoppel, on the grounds that the United States Customs and Immigration Service approved of their conduct in operating the immigrant investor program. The Constitution does not permit convictions to be obtained if the government has assured the

No. 21-30359

defendant that his or her conduct is permissible. If you find that the USCIS approved of the defendants' conduct in operating the immigrant investor program, you must find them not guilty. . . .

**ROA.423.**

"The defense of entrapment by estoppel is applicable when a government official or agent *actively assures* a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996) (emphasis added); *see also United States v. Treviño-Martinez*, 86 F.3d 65, 69 (1996) ("the government must *actively mislead* the defendant . . ." (emphasis added)); *United States v. Cornejo-Flores*, 254 F.3d 1082 (5th Cir. 2001) (table case) (per curiam) (requiring "an affirmative misrepresentation" by an official). This rule emphasizes that mere approval by a government official is insufficient to entitle defendants to an estoppel defense. Hungerford's proffered instruction did not track our rule, and therefore, the district court did not abuse its discretion in refusing it.

2.

Hungerford next contends that the district court plainly erred in issuing an instruction that read: "Ignorance of the law or even a mistake of law is not a defense." **ROA.4079.** Hungerford points to two potential defects in the instruction. First, he argues that the "maxim" that "ignorance of the law is no excuse" is subject to exceptions where a mistake of law eliminates the specific intent to commit a criminal act. **Blue Br. 79.** Second, Hungerford argues that even if the instruction was correct, it effectively negated the following good-faith-defense instruction.

In its entirety, the disputed instruction says:

No. 21-30359

> It is not necessary for the government to prove the defendants knew that a particular act or failure to act is a violation of the law. Ignorance of the law or even a mistake of law is not a defense. The defendants are entitled to a defense of good faith as a bar to a finding of criminal intent. Where 'intent to defraud' is a specific element of the count charged, it follows that a defendant who acts in 'good faith' cannot have the criminal intent required to commit these acts. Thus, if you find that any defendant acted in good faith in connection with the 'schemes to defraud' alleged by the government, you must find the defendants not guilty of these charges.

**ROA.4079.** Hungerford is quite right that it would constitute legal error to instruct the jury that ignorance of the law is no excuse because ignorance *can* be an excuse. *See, e.g.*, *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019). But Hungerford is wrong to focus on the "ignorance of the law" sentence in isolation because the rest of the instruction specifies that good-faith ignorance can negate intent. We cannot say this instruction, taken as a whole, constituted a clearly erroneous statement of the law.

But even assuming that the instruction was erroneous, there is little to suggest that it affected Hungerford's substantial rights. The prosecution offered substantial evidence of Hungerford's fraudulent scheme, and Hungerford responded with attempts to negate the specific intent element of his charges. And the trial court further clarified the jury instructions by reemphasizing the importance of the specific intent element, stating "if the evidence in this case leaves you with a reasonable doubt as to whether the defendants acted with an intent to defraud, then you must find them not guilty." **ROA.4079.** The jury therefore had ample opportunity to consider Hungerford's defense, and so he cannot show that this alleged error impacted his substantial rights.

3.

Hungerford next argues that the district court plainly erred by giving a deliberate-ignorance instruction. A deliberate-ignorance instruction allows the jury to find that the defendant knew a fact if the defendant deliberately turned a "blind eye" to it. To warrant a deliberate-ignorance instruction, the trial record must support "inferences that (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Oti*, 872 F.3d 678, 697 (5th Cir. 2017) (citation omitted). In making that fact-based determination, "the court reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government." *Id.*

Here, viewed in the light most favorable to the Government, the record supported the instruction. At a bare minimum, there was sufficient evidence that Milbrath deliberately ignored evidence of Hungerford's fraudulent conduct, such as backdating invoices. Because the two defendants were tried together, we cannot say that it was clear or obvious error to issue the deliberate ignorance instruction based on this evidence.

4.

Finally, Hungerford argues that the trial judge erred in referring the jury back to the original instructions when the jury sent a note expressing its confusion about the term "cause." Hungerford's counsel affirmatively consented to the district court's response, **ROA.4112**, which forecloses our review. *See United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995) ("Waived errors are entirely unreviewable, unlike forfeited errors, which are reviewable for plain error.").

But even if we could review for plain error, we would find none. "[A] trial judge, of course, enjoys wide latitude in deciding how to respond to such

questions." *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994) (citation omitted). In reviewing a trial judge's instructions, "we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions [if any] as a whole allowed the jury to understand the issue presented to it." *Id*. Finally, it is not an error to refer the jury back to the original instructions "if the original charge is an accurate statement of the law." *United States v. Marshall*, 283 F. App'x 268, 279 (5th Cir. 2008) (citing *United States v. Arnold*, 416 F.3d 349, 359 n.13 (5th Cir. 2005)).

Here, the original instructions defined "to cause" as "to cause interstate wire communications facilities is to do an act with knowledge that the use of the wire communications facilities will follow in the ordinary course of business or where such use can reasonably be foreseen." **ROA.4085, 4112.** This is an accurate statement of the law under the wire fraud statute. *See Pereira v. United States*, 347 U.S. 1, 8–9 (1954) (using this definition of "cause" in the context of mail fraud). Therefore, it was not an error (much less plain error) to refer the jury back to the original instruction.

E.

Hungerford's final argument is that, even if his other claims fail individually, they succeed cumulatively. To prove reversible cumulative error, Hungerford must show that the alleged errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *Oti*, 872 F.3d at 690 n.10 (quoting *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012)). Hungerford cannot make that showing. The evidence of Hungerford's guilt was overwhelming. And he cannot show prejudice from any of his alleged errors.

AFFIRMED.