# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20564

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

    Plaintiff–Appellee,

v.

WALTER FREEMAN JORDAN, III; JOHNATHON NICO WISE,

    Defendants–Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before ELROD, WILLETT, and OLDHAM, Circuit Judges.

DON R. WILLETT, Circuit Judge:

Walter Freeman Jordan, III and Johnathon Nico Wise were found guilty, along with several co-defendants, of aiding and abetting aggravated credit union robbery in violation of 18 U.S.C. § 2113(a), (d)(2). Jordan was additionally found guilty of aiding and abetting the brandishing of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii), (c)(2). They both appeal their convictions and sentences.

Jordan argues that (1) there was insufficient evidence to sustain his conviction; (2) the district court erred in permitting testimony that identified Jordan and Wise as brothers; and (3) the district court erred in permitting co-defendants' testimony regarding their own guilty pleas. Wise similarly argues that (4) there was insufficient evidence to support his conviction; and (5) the

No. 18-20564

district court erred in permitting testimony that identified Jordan and Wise as brothers. He additionally argues that (6) the district court plainly erred in failing to give a *Rosemond* instruction; (7) the district court clearly erred in applying a sentencing enhancement for the use of a firearm; and (8) the district court clearly erred in denying a Guidelines reduction for Wise's allegedly minimal role in the robbery.

We AFFIRM the convictions and sentences.

## I. BACKGROUND

Because Jordan and Wise both challenge the sufficiency of the evidence, it's necessary for us to dive into the record to understand what evidence was before the jury. We read the facts in the light most favorable to the jury's verdict.[1]

### A.    The Robbery

On July 24, 2017, the Houston Police Department was investigating Walter Jordan and monitoring a phone number—ending in 6601—attributed to him. By following cell tower signals,[2] officers observed the phone move from the Third Ward of Houston to the Cinco Ranch area. At the same time, surveilling officers followed Jordan as he drove a maroon Volkswagen Jetta from the Third Ward of Houston to the Cinco Ranch area. Both the phone and Jordan then traveled back to the Third Ward, at which point officers saw Jordan exit the Jetta.

The next morning, officers observed the phone move from its usual nighttime location earlier than usual, prompting them to begin surveillance on Greenmont Street. There, they identified a silver Chevrolet Malibu, black

---

[1] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).
[2] To track the cell phone, officers received updates from the service provider that showed which cell tower the phone was using to transmit data, which provided officers with the phone's general location at any given time.

Toyota Tundra, silver Nissan Rogue, and the maroon Jetta that Jordan had been driving the day before. Jordan, Wise, and others moved between the vehicles over the course of a couple of hours, and eventually, all four cars filed out in formation. As the four vehicles pulled off of Greenmont, heading west, officers followed in unmarked vehicles.

The vehicles drove to the Cinco Ranch area—the same area that Jordan had traveled to the day before. The four cars under surveillance then "scrambled." The fleet of about twenty officers initially followed the cars moving in various directions but then set up posts at different locations around the area. From their respective posts, the officers were able to continue observing the vehicles' movements. The 6601 phone was in the Cinco Ranch area at this time as well, with the signal bouncing between two nearby towers.

Officers noticed that the four cars seemed to be focused on First Community Credit Union. Each car spent about fifty minutes either parked—facing the credit union—or circling various streets that ultimately led back to the credit union. Eventually, the Tundra pulled into a parking spot in front of the credit union, and three men exited the truck and ran inside. A fourth man followed shortly after. Because the men's faces and hands were covered, officers were unable to physically identify them.

Once inside the credit union, two of the men jumped over the teller counter, demanded that the tellers get on the ground, and asked where the money was kept. One teller was then instructed to get back up and unlock her drawer; the robbers proceeded to go through the tellers' drawers, ultimately collecting money from two, including "bait bills."[3] The robbers then attempted to get into the vault, striking one bank employee when he failed to open it.

---

[3] "Bait bills" are fake monies that tellers log, according to numbers printed on the bills, every time they close out their drawers. These bills allow financial institutions and police officers to track stolen money.

No. 18-20564

When a teller informed them that she didn't know the vault combination either, one of the robbers lifted his shirt, revealed the gun in his waistband, and instructed her to get back on the ground. Shortly after, another person came into the credit union and shouted, "The cops are down the street." The robbers jumped back over the teller counter and fled the credit union. On their way out, one of the robbers pointed a gun at a customer attempting to enter the credit union, prompting the customer to turn around and return to his car.

After the robbers returned to the Tundra and began driving away, the Rogue, Jetta, and Malibu—which had been parked in various spots near the credit union—followed. Officers in marked vehicles followed the Tundra, while officers in unmarked vehicles stopped the others. Deandre Santee and Wise occupied the Rogue, Daryl Anderson occupied the Jetta, and Jaylen Loring occupied the Malibu. All four were detained.

Meanwhile, the officers' pursuit of the Tundra and its four occupants continued. The cars flew down the highway at speeds around 130 miles per hour until the Tundra exited. After it was off the highway, the Tundra made numerous turns, flew through red lights, and drove into oncoming traffic, eventually hitting a dead end. With nowhere left to turn, the Tundra's driver slammed on his breaks, and the passengers jumped out of the still-moving vehicle and began to flee on foot. One passenger—Raymond Pace—was not fast enough to get out of the Tundra's way and was crushed between the front bumper and a fence; officers called for medical assistance and placed Pace under arrest. The three other passengers continued running toward an apartment complex at the fence line.

4

No. 18-20564

Officers learned that Jordan's brother, Terrance,[4] lived in the apartment complex and promptly obtained a search warrant for his unit. With resistance, officers were able to make their way into the apartment.[5] Inside, they noticed still-wet hoodies in the washing machine that had the same markings as the ones worn by the robbers and a shoebox with a gun and pair of gloves that matched the gloves worn by the robbers. Outside of the unit, but still in the apartment complex, officers located a backpack on a small balcony between the second and third floors, which contained hoodies and gloves that matched the ones worn by the robbers and a pillowcase with cash, including the credit union's bait bills. Back at the Tundra, officers catalogued, among other things, gloves and a pistol found underneath the front passenger seat. They also retrieved a phone off of Pace that matched the 6601 number affiliated with Jordan, and another three phones were retrieved from inside the Rogue, one of which matched another phone number affiliated with Jordan. Phone records later confirmed that these phones were engaged in multiple calls with one another throughout the robbery.

## B. The Trial Testimony

Anderson and Loring, two of the individuals arrested in companion cars, testified against Jordan and Wise at trial. During direct examination, the prosecutor elicited testimony that both had pled guilty to aiding and abetting

---

[4] Though it is undisputed that Jordan and Terrance are brothers, and there is testimony that Jordan and Wise are brothers, there is no evidence to suggest that Terrance and Wise are related by blood.

[5] In its brief, the Government asserts that Jordan was engaged in a standoff with SWAT officers at the apartment and, after hours of negotiations, surrendered. However, this information does not seem to have been provided to the jury but instead was only included in Jordan's PSR. At one point, defense counsel asked Officer Helms whether "three males came from out of that apartment." Officer Helms confirmed that was correct and also confirmed that "[o]nly one of those males [was] charged." The charged male was not identified during this testimony. Because the circumstances of Jordan's arrest were not before the jury, we do not consider them in our review.

the robbery of the First Community Credit Union. They both also acknowledged that their goal in testifying was to reduce their sentences.

In his testimony, Anderson acknowledged his past convictions for giving a false name to a police officer, possessing a controlled substance, and displaying a false license plate. He then went on to explain his relationship with Jordan. Anderson told the jury that he had known Jordan most of his life and that, on the morning of the robbery, Jordan had enlisted his help in being a lookout during the robbery. At first, Anderson refused and left Greenmont Street with his "good friend," Santee. But then Jordan called him and begged for his help, promising that Anderson's only role would just be as "some extra eyes." Anderson agreed to be a lookout, and Jordan filled him in on the details. Santee and Anderson then sat in Santee's Rogue, and Santee asked what he was supposed to do. Anderson didn't give Santee any specific instructions but told him just to follow. Minutes later, Wise, who had been in the Jetta, got into the Rogue with Santee. Anderson got into the Jetta. Jordan entered the driver's seat of the Tundra. And the cars set off for the credit union. En route, those in the Tundra, Jetta, and Rogue engaged in a three-way call. The purpose of the call wasn't to chat, but to keep one another informed if any cops came into view or trouble arose. The driver of the Malibu, a woman who Anderson didn't know, joined the call as well; she let them know the credit union was all clear. Anderson testified that the Tundra then parked in front of the credit union, those in the Tundra went into the bank for ten to fifteen minutes, and then they came back out and fled. Anderson attempted to follow them, but was soon cut off by unmarked police vehicles and placed under arrest.

Loring testified that she met Jordan, also known as Wacko, on Instagram about a week before the robbery when he messaged her about the opportunity to make quick money. They met a couple of times over that week, and Jordan filled her in on his plan. Loring testified that Jordan was the driver of the

Tundra on the day of the robbery and that Jordan called her during their drive to the credit union to say, "Follow us," which she did in her Malibu. She continued to hear other voices during the drive, as though the phone was on speaker, but no one was speaking directly to those on the phone call. The only voice she recognized was Jordan's. At his direction, Loring went into the bank to ensure security wasn't inside—it wasn't. The Tundra then pulled into the parking lot, and the to-be robbers went inside. Loring remained on the phone throughout. She then saw the men leave the credit union, get back in the Tundra, and pull out. Loring attempted to follow, but she was quickly pulled over and arrested.

In addition to Loring and Anderson, numerous officers testified. Among them was Sergeant David Helms, who provided testimony regarding the evidence collected at the scene, forensic testing, and the relationship of the defendants. Specifically, he testified, over defense counsel's objections, that Wise and Jordan were brothers. During cross examination, defense counsel confirmed that Sergeant Helms acquired this knowledge during the course of the investigation and that neither Jordan nor Wise "tr[ied] to hide it from [him]."

## C.     The Verdict and Sentence

The defense moved for judgment of acquittal at the close of the Government's case-in-chief, which the district court denied, and the case was left with the jury. The jury found that Jordan and Wise were guilty of aiding and abetting aggravated credit union robbery, in violation of 18 U.S.C. § 2113(a), (d)(2). It additionally found Jordan guilty of aiding and abetting the brandishing of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), (c)(2).

Jordan and Wise were later sentenced by the district court, with their offense levels calculated using the 2016 Guidelines Manual. The district court

No. 18-20564

sentenced Jordan to 262 months' imprisonment on Count One and 84 months' on Count Two, to run consecutively for a total of 326 months' incarceration.

Wise's base offense level was 20. Among other enhancements, he received a 6-level increase because a firearm was used in the commission of the robbery. Wise objected to this enhancement and others and also argued that his offense level should be reduced because he played a minimal role in the crime. The district court overruled Wise's objection to the use-of-a-firearm enhancement and denied his request for a role-reduction. Over defense counsel's request for a punishment of 60 months' imprisonment, the district court imposed a term of 121 months'.

Jordan and Wise now appeal.

## II. DISCUSSION

### A.    Jordan's Claims on Appeal

#### 1. *The evidence was sufficient to support the jury's finding of guilt against Jordan.*

Issues regarding sufficiency of the evidence are largely fact-based questions that we review de novo.[6] And we "must affirm a conviction if, after viewing the evidence and all reasonable inferences 'in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[7] Importantly, this means that our review is "limited to whether the jury's verdict was *reasonable*, not whether we believe it to be *correct*."[8]

---

[6] *United States v. Oti,* 872 F.3d 678, 686 (5th Cir. 2017), *cert. denied,* 138 S. Ct. 1988 (2018).

[7] *Vargas-Ocampo*, 747 F.3d at 301 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[8] *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001) (emphasis added); *see also United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012) ("The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.").

No. 18-20564

Jordan argues that the evidence is insufficient to support a finding of guilt because the Government's case impermissibly "pile[d] inference upon inference" and there was no DNA or fingerprint evidence to link Jordan to the crimes.[9] His argument is unavailing. As the Government notes, the testimony of Anderson and Loring alone is sufficient to warrant a guilty verdict against Jordan on the first count—aiding and abetting robbery.[10] Anderson testified that Jordan enlisted his help in the robbery, was the driver of the Tundra, and was on the phone with him throughout the robbery. Loring also testified that Jordan enlisted her help in the robbery, was the driver of the Tundra, and was on the phone with her throughout the robbery. This testimony is substantial enough, on their face, to demonstrate that Jordan was involved in the robbery of the credit union.

Jordan argues that Anderson and Loring's testimony cannot support his conviction because they are incredible.[11] However, "[t]he jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses."[12] And, despite Jordan's assertion in his reply brief, none of Loring or Anderson's statements were so outside the realm of possibility that no juror could have believed them.[13] Jordan's counsel had every opportunity to impeach

---

[9] *See* Jordan's Br. at 25 (quoting *United States v. McDowell*, 498 F.3d 308, 314 (5th Cir. 2007)).

[10] *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994) ("[A] guilty verdict may be sustained if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face.").

[11] For instance, Jordan argues that Loring's testimony is incredible because she claimed that she thought robbery would be "easy," agreed to serve as a lookout after knowing Jordan for about a week and without "too much conversation" with him, and because there are inconsistencies in her statements. He argues that Anderson's testimony is incredible because he was testifying in hopes of receiving a reduced sentence, has a criminal record, and has inconsistencies in his statements.

[12] *United States v. Scott*, 892 F.3d 791, 797 (5th Cir. 2018) (internal quotation omitted).

[13] *See United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976) (noting that for "testimony to be incredible it must be unbelievable on its face"); *see also United States v.*

both Anderson and Loring for their previous acts of dishonesty and any inconsistencies in their testimony, and the jury independently weighed that testimony and determined that the evidence was sufficient to support a finding of guilt. We do not second-guess such findings.[14]

And even if Anderson and Loring's testimony wasn't credible, the other evidence presented at trial is sufficient to support a guilty verdict. Officers observed Jordan drive to and from the location of the robbery the day before the robbery in a vehicle that was used as a lookout during the robbery; a phone associated with Jordan moved in the same direction as Jordan the day before the robbery, and then that phone was used during the robbery and found on a co-defendant; and the bait bills and clothing worn by the robbers were found in or around Jordan's brother's apartment complex immediately after the robbery. From this evidence alone, a reasonable juror could conclude that Jordan participated in the robbery.[15]

As for the second count—aiding and abetting the brandishing of a firearm during and in relation to a crime of violence—the evidence also supports conviction. Anderson and Loring's testimony demonstrates that Jordan played a leadership role in organizing the robbery. Witnesses testified that a gun was brandished at a teller and pointed at a customer. A pistol was

---

*Gadison*, 8 F.3d 186, 190 (5th Cir. 1993) (noting that testimony is incredible, as a matter of law, if it relates to facts that the witness could not possibly have observed or events that could not have occurred under the laws of nature).

[14] *United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005) ("It is not our role, . . . under our standard of review for sufficiency of the evidence, to second-guess the determinations of the jury as to the credibility of the evidence.").

[15] Jordan argues that because the phone was not found on him, but was found on a co-defendant, there is insufficient evidence to support a finding of guilt. However, the jury is permitted to make reasonable inferences from circumstantial evidence, and one such reasonable inference is that, if a co-defendant was using Jordan's phone in the commission of a robbery, Jordan was a participant. Even if this evidence alone is not sufficient to warrant a guilty verdict, this evidence considered alongside the significant other circumstantial evidence is.

found in the Tundra driven by Jordan. And another gun was found in a shoebox at Jordan's brother's apartment under gloves resembling those used in the robbery. From this evidence, a reasonable jury could, and did, conclude that Jordan was aware that a firearm would be brandished in the commission of the robbery.

Jordan argues that the evidence is insufficient to link him to the crime because the pistol in the car was not loaded and his fingerprints weren't on the weapon.[16] However, whether Jordan ever held the pistol is of no moment because "[w]hover commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."[17] And the jury made a specific finding that Jordan had advance knowledge that a firearm would be used by someone during the crime. Given Jordan's role in the robbery, that a firearm actually was brandished in the credit union and pointed at a customer, and that Jordan was driving the car that housed a pistol, the jury's guilty verdict was reasonable.

### 2. *If the district court erred in admitting testimony that Jordan and Wise are brothers, the error was harmless.*

We review evidentiary rulings for an abuse of discretion, subject to the harmless error rule.[18] An abuse of discretion occurs when a ruling is grounded in a legal error or based on a clearly erroneous analysis of the evidence.[19] But even if such an error occurs, we will not reverse if the guilty verdict was unattributable to the error—the harmless error rule.[20]

---

[16] Jordan does not explain why it is relevant whether the weapons were loaded, but, presumably, he is arguing that, if the weapons weren't loaded, they weren't dangerous. However, "we find it unrealistic to require proof that the gun was actually loaded or that the perpetrator of the crime was disposed to use the weapon. The use of a gun is per se sufficient . . . ." *United States v. Parker*, 542 F.2d 932, 934 (5th Cir. 1976).

[17] 18 U.S.C. § 2(a).

[18] *United States v. Dunigan*, 555 F.3d 501, 507 (5th Cir. 2009).

[19] *United States v. Garcia*, 530 F.3d 348, 351 (5th Cir. 2008).

[20] *United States v. Cornett*, 195 F.3d 776, 785 (5th Cir. 1999).

No. 18-20564

Jordan argues that the district court erred in admitting Officer Helms' testimony regarding his relationship to Wise because the court lacked proper foundation and the testimony was more prejudicial than probative. The Government, however, did not respond to these arguments other than to say, "No error occurred, alternatively, any error was harmless."[21] Failing to provide any reasoning or law to support its statement that "[n]o error occurred," the Government has abandoned this argument.[22]

Though the Government has forfeited its argument as to whether an error occurred, it has not waived its argument as to whether the error was harmless. As the Government notes, the testimony was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict."[23] Before Officer Helms' testimony was presented, the jury had already heard testimony from two co-defendants who described Jordan's involvement in the robbery and from other officers who had traced Jordan's phone along the robbery route and described the clothing and bait bills found at the apartment complex of Jordan's other brother, Terrance. Because this substantial evidence supports the conclusion that Jordan was guilty of aiding and abetting robbery, during which a firearm was used—absent information about a relationship between Jordan and Wise—any error was harmless.[24]

### 3. The district court did not plainly err in admitting evidence that Loring and Anderson pleaded guilty.

---

[21] Government's Br. at 40–41.

[22] Fed. R. App. P. 28(a)(8)(A), (b) (noting that appellee's brief must include "contentions and the reasons for them, with citations to the authorities and parts of the record on which the [appellee] relies"). *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989) (treating inadequately-briefed arguments as abandoned).

[23] *United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013).

[24] *See United States v. El-Mezain*, 664 F.3d 467, 526 (5th Cir. 2011) ("It is well established that error in admitting evidence will be found harmless when . . . substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence.").

No. 18-20564

Evidentiary rulings are normally reviewed for abuse of discretion, subject to the harmless error rule.[25] But Jordan did not object to the admission of testimony regarding Loring and Anderson's guilty pleas in the district court, so we instead review the issue for plain error to determine whether the testimony "seriously affected [Jordan's] substantial rights."[26] To make this determination, we should consider (1) whether a limiting instruction was given; (2) whether there was a proper evidentiary purpose for introduction of the guilty plea; (3) whether there was an improper emphasis on or use of the plea as substantive evidence; and (4) whether the introduction was invited by defense counsel.[27]

First, the jury was specifically instructed that "[t]he fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of guilt of any other person." Second, the introduction of the guilty pleas served a proper evidentiary purpose: it "'blunt[ed] the sword' of anticipated impeachment" by revealing the witnesses' "blemished reputation[s]" before the defense could do so, avoiding the appearance of "an intent to conceal."[28] Third, the prosecution did not linger on the fact that the witnesses had pled guilty, but it merely acknowledged the pleas, and then revealed to the jury that both witnesses were testifying for the purpose of receiving a reduced sentence. Fourth, defense counsel cross-examined both Loring and Anderson about their guilty pleas and sought to impeach them for their cooperation with the Government.[29] We have held that "a defendant will not be heard to complain

---

[25] *Dunigan*, 555 F.3d at 507.

[26] *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990).

[27] *Id.*

[28] *United States v. Marroquin*, 885 F.2d 1240, 1246–47 (5th Cir. 1989) (quoting *United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir. 1983)).

[29] For example, defense counsel questioned Loring about the timing of her guilty plea and whether she received any promises from the Government in exchange for her testimony. Counsel also questioned Anderson about his guilty plea, eliciting testimony that

of [the] admission [of another's guilty plea] when he . . . attempts to exploit the evidence by frequent, pointed, and direct references to the [codefendant's] guilty plea."[30] Here, the defense did just that.

Because each factor weighs against a finding that Jordan's rights were seriously affected, the district court did not plainly err in admitting the testimony.

\* \* \*

A review of the record and relevant case law demonstrates that Jordan was convicted on the basis of sufficient evidence; the admission of evidence regarding his relationship to Wise was, at worst, harmless error; and the district court did not plainly err in admitting testimony of Anderson and Loring's guilty pleas.

## B.    Wise's Claims on Appeal

### 4. The evidence was sufficient to support the jury's finding of guilt against Wise.

Wise argues that the evidence was insufficient to support his conviction in two respects: first, that there was no evidence Wise "aided and abetted"; second, that there was no evidence Wise had advance knowledge that a weapon would be used. We review the first argument de novo,[31] but we review the second argument for a manifest miscarriage of justice.[32] Both are unavailing.

Wise first argues that the jury only received evidence that he was *present* during the robbery, but that it did not receive any evidence that Wise *participated*. To be sure, "presence at the scene and close association with those involved are insufficient factors alone; nevertheless, they are *relevant* factors

---

"[e]verybody's pled guilty except [Jordan and Wise]" and emphasizing that if Anderson didn't help the Government, "[he'd] be looking at a lot of time."

[30] *Leach*, 918 F.2d at 467.

[31] *Oti,* 872 F.3d at 686.

[32] *McDowell*, 498 F.3d at 312–13.

for the jury,"[33] and coupled with the "collocation of circumstances," they may permit a jury to infer that an individual participated in the crime.[34] Wise's argument asks us to assume that the jury ignored one of its key roles—making rational inferences—which we cannot do.[35]

Wise was observed moving between the robbery vehicles the morning of the crime before getting into the passenger seat of the Rogue—where Santee, who didn't have any details about the robbery, was the driver—and leaving for the credit union. Wise was later arrested in the Rogue, which was trying to follow the Tundra in its flight from the scene of the crime, and a phone that was used to place calls to the co-defendants during the robbery was found in Wise's seat. Viewing "all reasonable inferences in the light most favorable to the prosecution,"[36] a reasonable juror could conclude that Wise participated in the robbery, either by informing Santee of the details of the operation, serving as a lookout, manning the phones, or all three. In fact, it borders on fantasy to conclude that Wise would have ridden in the car throughout the crime without looking for the presence of cops or participating in the phone calls; such a conclusion goes against the "common knowledge of the natural tendencies and inclinations of human beings,"[37] and it cannot be sincerely considered.

Wise also argues that there was insufficient evidence to support his conviction because aggravated credit union robbery is a "combination crime," requiring both (1) a credit union robbery to occur and (2) an assault or threat

---

[33] *United States v. Sanchez*, 961 F.2d 1169, 1174 (5th Cir. 1992).

[34] *Id.* (quoting *United States v. Espinoza–Seanez*, 862 F.2d 526, 537 (5th Cir. 1988)); *see also Foy v. Donnelly*, 959 F.2d 1307, 1315 (5th Cir. 1992) (citations omitted) (acknowledging that "uncoerced presence at robbery amounts to very strong showing of intent"); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356 (1983) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . .").

[35] *Vargas-Ocampo*, 747 F.3d at 301.

[36] *Id.*

[37] *United States v. Gamez-Gonzalez*, 319 F.3d 695, 698 (5th Cir. 2003).

to the life of another person to occur by use of a dangerous weapon or device. As such, he argues, the jury was required to find both elements beyond a reasonable doubt[38] but no evidence was offered to show that Wise had advance knowledge that an assault or threat to life would occur. Even assuming that the jury was required to find advance knowledge, Wise did not raise this issue in making his motion for a judgment of acquittal, so it was not properly preserved for de novo review on appeal.[39] Instead, we should review for a manifest miscarriage of justice.[40] A manifest miscarriage of justice occurs where "the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be shocking."[41]

Though the evidence of Wise's guilt is more circumstantial than evidence connecting Jordan to the crime, the record is not so devoid of evidence that his guilty conviction is "shocking." For instance, Wise was observed moving between the four robbery vehicles the morning of the crime and communicating

---

[38] The jury was instructed that, to find a defendant guilty of aggravated robbery, it must find each of the following elements beyond a reasonable doubt: (i) the defendant took money from another; (ii) the money belonged to or was in the possession of a federal credit union at the time of the taking; (iii) the defendant took the money by means of force, violence, and intimidation; and (iv) the defendant assaulted and put in jeopardy the life of someone with the use of a dangerous weapon in the course of taking the money. It was further instructed that, to find a defendant guilty of *aiding and abetting* aggravated robbery, it must find that: (i) "the offense of Credit Union Robbery" (meaning the above-described crime) "was committed by someone"; (ii) the defendant associated with the crime; (iii) the defendant purposefully participated in the crime; and (iv) the defendant acted to make the crime successful.

[39] *McDowell*, 498 F.3d at 312–13 (noting that to preserve an issue for de novo review, a defendant must specifically raise the issue in making his Rule 29 motion); *see also United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) ("Where, as here, a defendant asserts *specific grounds* for a specific element of a specific count for a Rule 29 motion, he waives all others for that specific count." (internal quotation omitted)).

[40] *McDowell*, 498 F.3d at 313; *see also id.* (noting that, even though the Government incorrectly stated that the standard of review was de novo, the court, not the parties, determines the proper standard of review).

[41] *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002) (quotation omitted) (brackets omitted).

with various co-defendants. He ultimately switched vehicles with Anderson, who had been brought into the plan only that morning, so that he would be in the same car as Santee, who didn't have any details about the robbery. The evidence also demonstrates that Wise was on a conference call with the co-defendants throughout the commission of the robbery, and he was ultimately arrested in a vehicle following the fleeing Tundra after the robbery was completed. Witnesses testified that one bank employee was assaulted during the robbery; another employee was threatened, albeit implicitly, when one of the robbers brandished his firearm; and a gun was pointed at a bank customer when he tried to enter the credit union. Guns were later retrieved from the Tundra and from Jordan's brother's apartment in a shoebox with other robbery paraphernalia. Based on this evidence, a reasonable jury, without being manifestly unjust, could conclude that Wise was aware that his co-defendants would be carrying weapons in the commission of the robbery, and that those weapons would be used to threaten or assault those the robbers confronted.[42]

### 5. *If the district court erred in admitting testimony that Jordan and Wise are brothers, the error was harmless.*

As with Jordan's claim on this issue, Officer Helm's testimony regarding the relationship between Jordan and Wise was harmless as to Wise because it did not have a "substantial and injurious effect or influence in determining the jury's verdict."[43] Wise's participation in the robbery becomes no more or less

---

[42] *See, e.g.*, *Parker*, 542 F.2d at 934 (finding evidence sufficient where co-defendant brandished firearm during robbery); *United States v. Escamilla*, 590 F.2d 187, 191 (5th Cir. 1979 (finding evidence sufficient where co-defendant attended planning meetings related to the armed robbery); *see also Foy*, 959 F.2d at 1316 (finding defendant guilty of two armed robberies where the gun used belonged to defendant's father and defendant drove the getaway car after the second robbery, even though no direct evidence connected the defendant to the first robbery); *Whitmore v. Maggio*, 742 F.2d 230, 232 (5th Cir. 1984) (finding evidence sufficient where co-defendant fired a gun in front of defendant the morning of the robbery).

[43] *Demmitt*, 706 F.3d at 670.

true because of his relationship to Jordan.[44] With or without a brotherly connection, Wise was still observed moving between the vehicles prior to the robbery, seen entering the Rogue to join newly-recruited Santee before the cars left for the robbery, and arrested in the Rogue after the robbery. And whether Wise is Jordan's brother makes it no more or less likely that Wise dialed the co-defendants from the phone found in his seat or acted as a lookout instead of passively, innocently sitting in the car. Because this substantial evidence supports the conclusion that Wise was guilty of aiding and abetting aggravated robbery, regardless of any information about a relationship between Jordan and Wise, any error was harmless.

### 6. *The district court did not plainly err in failing to give a* **Rosemond** *instruction.*

We normally review jury instructions for an abuse of discretion, granting the district court "substantial latitude in describing the law";[45] however, because Wise failed to object to the omission of a *Rosemond* instruction at trial, we review instead for plain error.[46] To demonstrate plain error, Wise must show that (1) an error occurred; (2) the error was clear and obvious, not subject to reasonable dispute; and (3) the error affected his substantial rights.[47] An error is clear and obvious if controlling circuit court or Supreme Court precedent has clarified that the action, or inaction, is an error.[48] If we determine that all three factors are met, we "ha[ve] the *discretion* to remedy

---

[44] *See El-Mezain*, 664 F.3d at 526 ("It is well established that error in admitting evidence will be found harmless when . . . substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence.").

[45] *United States v. Sertich*, 879 F.3d 558, 562 (5th Cir. 2018).

[46] *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001).

[47] *Puckett v. United States*, 556 U.S. 129, 135 (2009).

[48] *Id.*

the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"[49]

Wise argues that the district court erred in failing to instruct the jury that, to find Wise guilty, they must also find that he had advance knowledge that a firearm would be used—a *Rosemond* Instruction. In *Rosemond v. United States*, the Supreme Court held that a defendant could not be found guilty of aiding and abetting a drug trafficking crime with the use of a firearm—a violation of 18 U.S.C. § 924(c)—unless the jury found that he had prior knowledge that his confederates would carry a gun because § 924(c) requires both that (1) a drug trafficking or other violent crime occur; and (2) a firearm be used in the process.[50] Even though a defendant *does not* have to *perform an act* in pursuit of each element of the crime, the Court held that the defendant *does* have to *intend* for each element to occur.[51] And, the Court clarified, that intent can only be demonstrated where the defendant had advance knowledge—"knowledge that enables him to make the relevant legal (and indeed, moral) choice"—of the aggravating factor.[52] In other words, a defendant can only be guilty as an aider or abettor of a § 924(c) offense if he had an opportunity to either alter the plans so that a firearm would not be used or withdraw from the firearm-infused enterprise altogether.[53]

We have since interpreted *Rosemond* to have created a general rule that "when a combination crime is involved, an aiding and abetting conviction requires that the defendant's intent 'go to the specific and entire crime

---

[49] *Id.* (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).
[50] 572 U.S. 65, 77 (2014). The Court "coin[ed] a term . . . combination crime" to describe § 924(c) because "[i]t punishes the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm." *Id.* at 75.
[51] *Id.* at 78.
[52] *Id.*
[53] *Id.*

charged.'"[54] But there is one important caveat to this general rule. In *Rosemond,* the Supreme Court expressly declined to answer whether a defendant must have had advance knowledge of the aggravating offense if it is a "natural and probable consequence" of the predicate crime.[55] The Court acknowledged that some authorities suggest that advance knowledge is not necessary in those circumstances, but "because no one contend[ed] that a § 924(c) violation is a natural and probable consequence of simple drug trafficking[,] . . . [the Court] express[ed] no view on the issue."[56] So it remains an open question.

Which brings us back to our case. In a series of unpublished opinions, panels of this court have held that district courts did not commit plain error in failing to give a *Rosemond* instruction because neither this court nor the Supreme Court has explicitly ruled that such an instruction is necessary.[57] Wise argues that we, in *United States v. Baker*, have since ruled that a *Rosemond* instruction is required in cases such as this one.[58] However, *Baker*

---

[54] *United States v. Carbins*, 882 F.3d 557, 566 (5th Cir. 2018) (quoting *Rosemond*, 572 U.S. at 75).

[55] 572 U.S. at 76 n.7.

[56] *Id.*

[57] *See, e.g., United States v. Gibson*, 709 F. App'x 271, 274 (5th Cir. 2017); *United States v. Saunders*, 605 F. App'x 285, 289 (5th Cir. 2015) (holding that, even assuming jury charge was inadequate under *Rosemond*, court had not committed plain error because "it was reasonably foreseeable that [co-conspirator] would bring a firearm to a bank robbery" because "[b]ank robberies are violent crimes, which often require [confrontation]"); *see also Hughes v. Epps*, 561 F. App'x 350, 354 n.4 (5th Cir. 2014) (holding that *Rosemond* did not apply to cases involving robbery under Mississippi law because the Mississippi Supreme Court has held that the use of a firearm is a natural and probable consequence of simple robbery). *But see United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978) ("[I]n a prosecution for aiding and abetting armed bank robbery, the government must establish not only that the defendant knew that a bank was to be robbed and became associated with and participated in that crime, but also that the defendant 'knew that (the principal) was armed and intended to use the weapon[] and intended to aid him in that respect.'" (quoting *United States v. Short*, 493 F.2d 1170, 1172 (9th Cir. 1974)). *Longoria* was decided nearly thirty years before *Rosemond* and does not confront the "natural and probable consequence" theory.

[58] 912 F.3d 297, 314–15 (5th Cir.), *superseded by United States v. Baker*, 923 F.3d 390 (5th Cir. 2019).

was amended and superseded on panel rehearing.[59] In the amended opinion, we "[did] not address Baker's challenge to the jury instructions under *Rosemond*."[60] This case therefore does not assist in our review and reinforces that an open question remains. Because the law is not clearly settled, the district court could not have plainly erred in failing to give a *Rosemond* instruction.

### 7. *The district court did not clearly err in applying a six-level Guideline enhancement for the use of a firearm.*

The district court's interpretation of the Sentencing Guidelines is reviewed de novo, and its factual findings are reviewed for clear error.[61] Under clear-error review, a finding of fact will only be reversed if it is "implausible in light of the record as a whole."[62]

Wise argues that the district court clearly erred in applying a six-level enhancement for "otherwise us[ing]" of a firearm during the credit union robbery. He makes two primary arguments: (1) the use of a firearm was not reasonably foreseeable to Wise and (2) at most, Wise should have only received a five-level enhancement because a firearm was brandished, not "otherwise used."

Wise argues that the district court erred in finding that the use of a firearm was reasonably foreseeable[63] to Wise because the Government did not offer any testimony from co-defendants regarding a plan to use weapons. However, for the same reasons that the evidence was sufficient to support a finding that Wise aided and abetted aggravated robbery, the district court had

---

[59] *Baker*, 923 F.3d 390.

[60] *Id.* at 406.

[61] *United States v. Lawrence*, 920 F.3d 331, 334 (5th Cir. 2019).

[62] *United States v. Griffith*, 522 F.3d 607, 611–12 (5th Cir. 2008).

[63] U.S. Sentencing Guidelines Manual (U.S.S.G.) § 1B1.3 (2016). ("[A] defendant is held responsible for all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.").

sufficient evidence to conclude that the use of a firearm was reasonably foreseeable to Wise. As discussed, Wise was seen moving between the robbery vehicles and communicating with the various co-defendants prior to the crime, he was on a conference call with all of the co-defendants before and during the robbery, he was arrested in one of the robbery vehicles immediately after the crime, and multiple guns were found in close proximity to other robbery-related evidence. From this, it is reasonable to conclude that the use of a firearm was foreseeable to Wise.

Even absent this specific evidence, the nature of credit union robbery and Wise's complicity in that robbery alone may be sufficient to support the district court's finding. For instance, in *United States v. Burton,* we held that the district court did not err in applying a six-level sentencing enhancement where the defendant was present during an armed robbery, even though he did not physically possess the weapon, "given the nature of bank robbery," which is, by its nature, a violent crime.[64] As in *Burton,* the district court here did not commit clear error.

Wise further argues that, even if it was reasonably foreseeable that a firearm would play a role during the robbery, he should have only received a five-level enhancement, not six, because the firearm was only brandished, not otherwise used. However, this argument is belied by the facts and the law. Though a gun was brandished at the bank teller, testimony at trial revealed that the robbers also pointed a gun in a customer's face on their way out of the credit union. The distinction between "brandishing" and "otherwise using" is essential.[65] While brandishing "can mean as little as displaying part of a

---

[64] 126 F.3d 666, 679 (5th Cir. 1997); *see also id.* (suggesting that a defendant may be held accountable for the use of a firearm even if he is merely the driver of the getaway car (citing U.S.S.G. § 1B1.3 cmt. 4(B)(i)).

[65] *Dunigan,* 555 F.3d at 505.

firearm or making the presence of the firearm known in order to intimidate,"[66] otherwise using a weapon includes pointing the weapon at an individual in a specifically threatening manner.[67] Because the robbers here did both— brandished and otherwise used a gun—during the commission of the robbery, the district court did not err in applying a six-level enhancement to Wise's sentence.

### 8. *The district court did not clearly err in denying Wise's request for a Guidelines reduction for his role in the robbery.*

As with the application of the six-level enhancement, we also review the district court's decision not to apply a sentencing reduction de novo on the law, but for clear error on the facts.[68]

Wise argues that he should have received a three-point reduction in his sentence because he was a "minimal participant" in the crime, or, at least, he should have received a two-point reduction because he was a "minor participant." A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group,"[69] while a minor participant is one who "is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."[70] Wise argues that either definition can be applied to him because "the evidence show[s] [that Wise] was nothing more than a passenger who recruited no one, scouted nothing, planned nothing, directed no one, drove nothing, spoke to no one, and never got out of the car."[71] And, in any event, Wise argues, the evidence shows that the co-defendants played much more substantial roles

---

[66] *Id.* (internal quotation omitted).

[67] *Id.*

[68] *United States v. Sanchez-Villarreal*, 857 F.3d 714, 721 (5th Cir. 2017).

[69] U.S.S.G. § 3B1.2. cmt. 4.

[70] U.S.S.G. § 3B1.2. cmt. 5.

[71] Wise Br. at 51.

than Wise, such as by driving the vehicles, entering the bank as a robber, or even entering the bank as a lookout.

In assessing whether to reduce a defendant's sentence for his role in a crime, a district court should consider, among other things: (i) the defendant's understanding of the scope and structure of the criminal activity; (ii) the defendant's participation in planning or organizing the criminal activity; (iii) the defendant's decision-making authority or influence; and (iv) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts."[72]

From the evidence presented, and despite Wise's contentions otherwise, the court could reasonably conclude that: (i) Wise had at least as much, if not more, knowledge about the scope and structure of the crime than Anderson, Santee, and Loring, based on Wise's movement between the vehicles and because he switched cars with Anderson and instead rode with Santee—a newly recruited and uninformed confederate; (ii) Wise was at least somewhat involved in the planning or organizing of the details of the robbery based on his communication with the co-defendants and that he rode with the least informed confederate during the crime; and (iii) Wise's participation was at least equal to the other lookouts' who followed the Tundra—he too kept an eye out for police officers, maintained communication throughout the crime, and attempted to flee from the scene. As Wise notes, the Government did not provide evidence that Wise had decision-making authority. But, even without such evidence, the other three factors support the district court's finding that Wise was not a minimal or minor participant. Therefore, the district court did

---

[72] U.S.S.G. § 3B1.2. cmt. 3(C).

not clearly err in declining to grant a point reduction based on Wise's role in the criminal activity.

\* \* \*

A review of the record and relevant case law demonstrates that Wise was convicted on the basis of sufficient evidence; the admission of evidence regarding his relationship to Jordan was, at worst, harmless error; the district court did not plainly err in failing to give a *Rosemond* instruction; and the district court did not clearly err in applying a six-level enhancement for the "otherwise use" of a firearm or in not applying a two- or three-level reduction for Wise's role in the crime.

## CONCLUSION

Neither Jordan nor Wise has shown any reversible error, and their convictions and sentences are AFFIRMED.